## Bacon Estate

*Eastburn & Gray*, for accountant.

*S. A. Litzenberger*, for claimant.

SATTERTHWAITE, P. J., February 1, 1968.—The first and final account of Ruth E. Bacon, administratrix of the estate of said decedent, was presented to the court

for audit, confirmation and distribution of ascertained balances on September 5, 1967, as advertised according to law. . . .

At audit, two unpaid claims of creditors in decedent's lifetime were presented. One of these, a loan to decedent in the amount of $1,000 by one Jennie Donachie, was duly proven by a written memorandum and is not challenged by any one in these proceedings. Accountant has not paid the same solely because funds in her hands for distribution as above noted would be insufficient to pay that claim in full, if the second claim, that of L. Dubrow & Sons, Inc. [Dubrow], hereinafter discussed, also be allowed. Accordingly, the claim of Jennie Donachie in the full amount of $1,000 is hereby recognized as valid and subsisting, together with interest thereon from October 24, 1967, interest for the year prior to the latter date having been deducted in advance.

The second or Dubrow claim is based on decedent's lifetime agreement for the purchase of furniture, which transaction was not consummated because of his death prior to the time for delivery of the goods purchased and accountant's refusal to accept the same after his death. This claim, liquidated in counsel's brief for the first time in any specified amount, is for $3,513.50, the alleged balance due [after certain now conceded credits] on the full original purchase price which decedent had agreed to pay. Accountant, while not denying such liability on the purchase contract as may be legally required to the extent of assets in her hands, and conceding that the obligation thereof against decedent's estate was not terminated by decedent's death [compare Fegelson Estate, 40 D. & C. 2d 278, 16 Bucks 125 (1966)], does dispute the amount claimed as damages, and would require claimant to prove the basis for compensation legally due. She contends that, as pointedly demonstrated by the absence

of delivery of the goods, such compensation would not be measured by the full remaining balance of the entire purchase price. Moreover, she also reasons that in any event her acquiesence in the forfeiture of decedent's lifetime deposit with Dubrow on account of the furniture contract in fact amounted to more than adequate damages for the default.

From the evidence at the audit hearing, it appeared that in the fall of 1966, decedent, a widower, was contemplating marriage with one Eleanor Brady and had purchased a house for their proposed marital domicile. On October 1, and again on October 24, 1966, decedent and Miss Brady together visited Dubrow's place of business as a furniture dealer in Philadelphia to make selection of furnishings for their new home. Decedent, on one or the other of these two dates, ordered all of the articles in question, consisting of certain rugs, a 10-piece dining room suite, a 6-piece bedroom suite, another 5-piece bedroom suite, with mattresses and box springs to match, two sofas, a "rollaway" cot, a cocktail table and various other side pieces and chairs, a vacuum cleaner and attachments, and a floor polisher. All of these items [except the floor polisher at $24.88, which decedent apparently took with him on October 24th] were ordered for future delivery in January 1967 in the new home. The total of the purchase prices which decedent thereupon agreed to pay for these various articles [itemized at length in Dubrow's Ex. Nos. 1, 2, 3, 6, 7 and 8] aggregated $5,368.48. Decedent made cash deposits on October 1, 1966 or shortly thereafter of $1,030, and on October 24, 1966, received certain credits for cancellations and changes in the further amount of $105.53 [see Dubrow Ex. Nos. 4 and 5]. The net unpaid purchase price, accordingly, was $4,232.95.

Unfortunately, the parties' arrangements and undertakings so outlined were never carried out, being

interrupted by decedent's apparently untimely death on November 1, 1966, only one week after the latter of the Dubrow tansactions. Since the contemplated marriage had not come about and since accountant, who was decedent's daughter and only intestate heir, refused to accept the furniture or complete the purchase contract, notice was given through counsel to Dubrow on January 16, 1967, of the fact of decedent's death, and this was followed a month later by formal notice to Dubrow of accountant's "cancellation". Subsequent negotiations for an amicable settlement of the claim were apparently unsuccessful.

A seller's remedies for breach of a buyer's contract to purchase goods are enumerated in section 2-703 of the Uniform Commercial Code of October 2, 1959, P. L. 1023, as amended, 12A PS §2-703. The only ones presently relevant in any possible view of the case are the cross-references to sections 2-706, 2-708 and 2-709. [It may be conceded, for present purposes, that Dubrow had properly "identified to the contract" all of the goods in question prior to the time it was notified of decedent's death and accountant's purpose to repudiate the purchase, within the meaning of section 2-704 of the code.] The auditing judge is of the opinion that Dubrow has not borne the burden of proof required of it to permit recovery herein under any of these provisions.

Section 2-706 authorizes the seller, on the buyer's rejection of the goods, to resell the same upon reasonable notice to the buyer of intention so to do, and, upon compliance with certain other cautionary provisions, thereupon to recover from the buyer the difference between the resale price and the contract price. This provision is presently unavailing for the reason that, until passing mention was made thereof in the audit testimony of Dubrow's sales manager, no notice whatsoever of intention to resell thereunder was given,

so far as the record discloses; even more decisively, according to Dubrow's own evidence, no resale of the goods has in fact yet been made.

Section 2-708, the generally applicable provision defining the seller's measure of damages for the buyer's default where the goods are improperly rejected, authorizes the seller to recover the difference between the market price and the unpaid contract price, with further provision in subsection (b) under certain circumstances for allowance of the profit the seller would have made as an alternative measure of damages. This section likewise is of no help to Dubrow for the reason that no evidence was submitted in the within proceedings either of market price or of profit.

Dubrow relies solely and entirely upon section 2-709, claiming it is entitled thereunder to the full amount of the unpaid agreed purchase price as to most of the items. This section provides, in presently relevant part:

"(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price

(a) . . . [of goods accepted, etc.] . . .

(b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing".

In his brief, counsel for Dubrow has conceded that certain of the items are not within this section, and hence he has in effect given credit therefor against the total claimed to be due. These articles include $152.50 for rug underpads not cut or used and $122 for unincurred labor charges included in the agreed price of the rugs for laying the same; $238 for the two standard mattresses and two box springs; $39 for the stock "rollaway" cot; $89 for the standard and not unusual rugs shown on Dubrow Ex. No. 6; and $108.95 for the

vacuum cleaner and attachments. These credits, when added to those already mentioned for decedent's deposits and the credit memos dated October 24, 1966, leave a balance of the original sales prices of $3,483.40, [not the $3,513.50 which counsel claims to be due].

In support of his position that Dubrow is entitled under section 2-709 to the unpaid balance of the agreed purchase price of the goods not so eliminated, counsel relies upon two circumstances: (1) the allegedly peculiar and unusual nature of the respective items themselves as ordered specially on decedent's behalf, a situation which, according to counsel, would justifiably indicate that resale would be reasonably regarded as impossible; and (2) in purported corroboration of (1), the alleged inability of Dubrow in fact to resell the same despite efforts so to do. Here again, however, the credible evidence does not provide an adequate or persuasive factual basis for the conclusions so urged.

The testimony of Dubrow's witnesses, even if regarded most favorably to its position, would properly permit the conclusion only that a substantial part of the rugs and furnishings in question were items prepared to special size or obtained on special order, that is, that they were not filled out of Dubrow's existing stock or inventory but had to be cut to dimension or ordered specifically from a manufacturer out of the latter's catalogue. For example, most of the rugs [amounting to almost $1,500 of the present claim] while cut to particular [and odd-sized] lengths to meet the measurements of decedent's new home for which they were intended, were taken from rolls of standard and unmodified widths of carpeting, and except for such odd lengths would not appear to have been so unusual as to be totally without normal resale characteristics at a mark down of some sort or upon recutting to other lengths. Similarly, the dining room suite [at $767] consisted of components specially ordered to a

particular design and model, but it was unusual only because of the white and gold fabric seat covers ordered for the chairs. Neither of the two bed room suites [at $495 and $349, respectively] was even stated as having been specially ordered, except for a mirror [value $60-$70] for one. One sofa [$529] was unusual in size [108 inches] as well as in the white fabric in which it was specially ordered; the other sofa [$219] was apparently standard except for the tangerine color of its covering; neither would seem so peculiar as to be entirely unsaleable to anyone else.

In short, while it may well be that there would be some amount of difficulty in disposing of much of this merchandise at the prices which decedent had agreed to pay, largely because of the apparently extreme choices of colored fabrics in which some thereof were made up, the auditing judge is not persuaded that all of it, or even a substantial part thereof, was of such a character as would "reasonably indicate that [reasonable efforts to resell at reasonably marked-down prices] will be unavailing". In particular, the auditing judge finds completely incredible the opinion of Dubrow's sales manager that the probability was "very nil" for "recovering any money by future sales of these goods". The patently exaggerated nature of this overstatement, and the self-serving generality and lack of specificity similarly running through a large part of his entire testimony, certainly created no inferences in Dubrow's favor in this respect.

Furthermore, the foregoing uncertainties and deficiencies were not clarified or affected in the slightest by the second phase of claimant's case to the effect that it in fact had been unable to resell [apparently] any of the articles in question. This evidence was completely inconclusive. The record is totally barren of any information [other than the generality that they had been "displayed" in an undisclosed place and manner

for an uncertainly specified time and under undisclosed circumstances, for sale at apparently a flat and overall twenty-five percent mark-down], which would provide any basis for passing upon the reasonableness of Dubrow's purportedly ineffectual efforts to resell. It should also be recalled that apparently no notice of intention to effect a resale was ever given to accountant.

In sum, the auditing judge is of the opinion that claimant Dubrow, while unquestionably entitled in the abstract to some amount of damages for breach of decedent's contract of purchase, has grossly overplayed its position by unrealistically and unconvincingly insisting on full purchase price damages under section 2-709, when it should have been content to propose its remedies under the resale price theory of section 2-706 or the market value theory of section 2-708. Having failed to substantiate its excessive demands, it is left in the position of having proven no case at all. Indeed, having been permitted to retain both decedent's not inconsequential deposits as well as the goods themselves, it may well have already obtained more than it was legally entitled to in any event.

The claim of L. Dubrow & Sons, Inc. is accordingly denied and refused. . . .

And now, February 1, 1968, the within adjudication is directed to be filed and is hereby confirmed nisi.